### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

————————————————————

)
MANUEL GUDIEL GARCIA, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    Civil Action No. 11-527 (RBW)
    )
KATHLEEN SEBELIUS,    )
Secretary of Health and Human Services,    )
et al.,    )
    )
    Defendants.    )
————————————————————)

### <u>MEMORANDUM OPINION</u>

The plaintiffs bring this action under the Alien Tort Statute, 28 U.S.C. § 1350 (2006), and the United States Constitution seeking redress for "non-consensual human medical experimentation that took place in Guatemala from . . . 1946 to 1953, and any subsequent medical testing that lasted beyond 1953 at the hands of American and Guatemalan doctors and government officials . . . who were continuing the initial program." First Amended Class Action Complaint for Injunctive Relief and Damages ("1st Am. Compl.") ¶¶ 2, 14. Currently before the Court are the following motions: (1) the United States' Motion for Substitution on Counts 1 and 2, and Memorandum of Points and Authorities ("Gov't's Mot. to Sub."); (2) the United States' Motion to Dismiss and Memorandum of Points and Authorities ("Gov't's Mot. to Dismiss"); (3) the Individual Federal Defendants' Motion to Dismiss and Memorandum of Points and Authorities ("Fed. Defs.' Mot."); (4) Defendant Mirta Roses' Motion to Dismiss Plaintiffs' First Amended Complaint; and (5) the plaintiffs' Motion for Entry of Default Judgment as to Defendant PAHO Director Periago ("Pls.' Mot."). Upon careful consideration of the parties'

submissions,[1] the Court concludes for the following reasons that the defendants' motions to dismiss must be granted, and the plaintiffs' motion for entry of default judgment must be denied.

## I. BACKGROUND

The following facts are either undisputed or taken from the First Amended Complaint. From 1946 to 1953, officials from the United States Public Health Service and the Pan American Sanitary Bureau conducted medical studies in Guatemala that "involved deliberate infection of people with sexually transmitted diseases ("STDs") without their consent." (the "Guatemala Study").  Pls.' Consol. Opp'n, Exhibit ("Ex.") 1 (September 2011 Report by the Presidential Commission for the Study of Bioethical Issues ("Presidential Commission Report")) at 2, 6.[2] "Subjects were exposed to syphilis, gonorrhea, and chancroid, and included prisoners, soldiers from several parts of the [Guatemalan] army, patients in a state-run psychiatric hospital, and commercial sex workers."  Id. at 2.  None of the subjects of the Guatemala Study gave "their informed consent to participate," 1st Am. Compl. ¶ 68, as they were not provided with "information about the procedures or their risks" prior to participating in the study, id. ¶ 124. "Instead of consent from the subjects [housed in institutions], the medical team sought

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Defendant Mirta Roses' Memorandum in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Roses's Mem."); (2) the Plaintiffs' Consolidated Opposition to the United States Defendants' Motion to Dismiss ("Pls.' Consol. Opp'n"); (3) the Plaintiffs' Response in Opposition to Defendant PAHO Director Mirta Roses Periago's Motion to Dismiss Plaintiffs' First Amended Complaint ("Pls.' Opp'n to Roses's Mot."); (4) the Reply in Support of the United States' Motion for Substitution ("Gov't's Mot. to Sub. Reply"); (5) the Reply in Support of the United States' Motion to Dismiss ("Gov't's Mot. to Dismiss Reply"); (6) the Reply in Support of the Individual Federal Defendants' Motion to Dismiss ("Fed. Defs.' Reply"); and (7) Defendant Mirta Roses' Reply in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Roses's Reply").

[2] The Court may consider the Presidential Commission Report in resolving the defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) both because it relays facts that are undisputed by the parties, see Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992) (When deciding "a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)[,] . . . the court may consider the complaint supplemented by undisputed facts evidenced in the record."), and because the Report is incorporated by reference in the First Amended Complaint, see 1st Am. Compl. ¶¶ 6-12; Keller v. Embassy of U.S., 522 F. Supp. 2d 213, 217 (D.D.C. 2007) ("In deciding a 12(b)(6) motion, the court may consider . . . 'documents attached as exhibits or incorporated by reference in the complaint.'" (citation omitted)).

cooperation from the institution[s] in which their prospective subject pool resided" by providing those institutions with "essential supplies, such as epilepsy medication to the mental asylum, malaria medication to the orphanage, and refrigerators for medications."  Id. ¶ 68.

One of the objectives of the Guatemala Study was "to determine whether penicillin, then a recently-discovered cure for syphilis, could also be used as a prophylaxis."  Id. ¶ 71. "[A]nother goal was to find the most effective way to inoculate patients with [syphilis]."  Id. ¶ 72.  The study was conducted in Guatemala for several reasons, including that it was "a location where [the medical team could] carry out more invasive methods of inoculation with venereal diseases without ethical scrutiny."  Id. ¶ 62.  "In total, the medical team intentionally exposed nearly 700 people to syphilis, nearly 600 to gonorrhea, and over 100 to chancroid—all serious venereal diseases."  Id. ¶ 70.

The Guatemala Study "finally came to light in the [F]all of 2010."  Id. ¶ 5.  On November 24, 2010, President Barack Obama issued a letter to the Chair of the Presidential Commission for the Study of Bioethical Issues, noting the recent revelation "that the U.S. Public Health Service conducted research on sexually transmitted diseases in Guatemala from 1946 to 1948 involving the intentional infection of vulnerable human populations."  Pls.' Consol. Opp'n, Ex. 1 (Presidential Commission Report) at vi.  Acknowledging that "[t]he research was clearly unethical," President Obama directed "the Presidential Commission for the Study of Bioethical Issues to . . . . oversee a thorough fact-finding investigation into the specifics of the U.S. Public Health Service Sexually Transmitted Diseases Inoculation Study."  Id.  He instructed "the Commission to complete its work within 9 months and provide [him] with a report of its findings and recommendations."  Id.

Prior to the release of the Presidential Commission Report, the plaintiffs instituted this

action on March 14, 2011.  <u>See</u> Class Action Complaint for Injunctive Relief and Damages at i.

The Court stayed the proceedings in this case pending release of the Presidential Commission

Report, and, following its release in September 2011, the plaintiffs amended their Complaint on

November 10, 2011, to reflect the Report's findings.  <u>See</u> 1st Am. Compl. ¶¶ 6-12.[3]

The named plaintiffs in this case "are either the victims of or the legal heirs to victims of

the non-consensual human medical experimentation that [the d]efendants conducted in

Guatemala," <u>id.</u> ¶ 18, who "bring this action individually" and as a class action on behalf of

similarly situated individuals, <u>id.</u> ¶ 28.  Their First Amended Complaint asserts claims under the

Alien Tort Statute for violations of the prohibition against medical experimentation on non-

consenting human subjects, <u>id.</u> ¶¶ 133-40 (First Claim for Relief), and for cruel, inhuman, or

degrading treatment, <u>id.</u> ¶¶ 141-47 (Second Claim for Relief).  The plaintiffs also assert a

substantive due process claim under the Fifth Amendment of the United States Constitution, <u>id.</u>

¶¶ 148-56 (Third Claim for Relief), and a claim under the Eight Amendment for cruel and

unusual punishment, <u>id.</u> ¶¶ 157-65 (Fourth Claim for Relief).

Eight of the nine defendants are current office-holders with the federal government (the

"federal defendants"); they are (1) Kathleen Sebelius, Secretary of the United States Department

of Health & Human Services ("HHS"); (2) Howard Koh, Assistant Secretary for Health at HHS;

(3) Vice Admiral Regina Benjamin, Surgeon General of the United States Public Health Service;

(4) Thomas Frieden, Director of the United States Center for Disease Control and Prevention

("CDC"); (5) Rima Khabbaz, Director of the Office of Infectious Diseases at the CDC; (6) Kevin

---

[3] Defendant Mirta Roses Periago did not timely respond to the plaintiffs' first Complaint, and upon the plaintiffs' motion, the Clerk of the Court declared her in default on September 15, 2011.  ECF No. 11.  The plaintiffs later filed a motion for entry of default judgment on October 6, 2011, which the Court will address in this Memorandum Opinion.

Fenton, Director of the National Center for HIV/AIDS, Viral Hepatitis, STDs and Tuberculosis Prevention at the CDC; (7) Gail Bolan, Director of the Division of STD Prevention at the CDC; and (8) Harold Varmus, Director of the National Cancer Institute at HHS. Id. ¶¶ 36-43. The ninth defendant is Mirta Roses Periago ("Roses"),[4] Director of the Pan-American Health Organization, formerly the Pan-American Sanitary Bureau. Id. ¶ 44. While implicitly acknowledging that none of the nine defendants had any involvement in the Guatemala Study, which ended in the 1950s, the plaintiffs maintain that the defendants "are liable under the principles of successor liability for the acts of their predecessor office-holders." Id. ¶ 45.

Currently before the Court are a number of motions filed by the defendants asserting various types of immunity in response to the plaintiffs' claims. First, the United States has moved to substitute itself in place of the federal defendants as to the plaintiffs' Alien Tort Statute claims pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(1) (2006). Gov't's Mot. to Sub. at 1, 3. Second, assuming that it will be substituted in place of the federal defendants with respect to the plaintiffs' Alien Tort Statute claims, the United States has moved for dismissal of those claims pursuant to Federal Rule of Civil Procedure 12(b)(1) based on sovereign immunity. Gov't's Mot. to Dismiss at 6. Third, the federal defendants have moved for dismissal of the claims against them under Rules 12(b)(1) and 12(b)(6), invoking both statutory and qualified immunity. Fed. Defs.' Mot. at i, 7. Fourth, defendant Roses has moved for dismissal of the claims against her pursuant to Rule 12(b)(1), also asserting statutory immunity. Roses's Mem. at 1-2. In addition to the defendants' motions, the plaintiffs have moved for entry of default judgment against defendant Roses based on her failure to timely respond to the plaintiffs' complaint. Pls.' Mot. at 1, 2-4.

---

[4] The plaintiffs refer to this defendant as "Mirta Roses Periago," Pls.' Mot. at 1, while she calls herself "Mirta Roses," Roses's Mem. at 1. The Court will refer to her as "Roses" in this Memorandum Opinion.

## II.  STANDARDS OF REVIEW

When a defendant moves for dismissal under Rule 12(b)(1), "the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  However, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citing Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992)).

A Rule 12(b)(6) motion tests whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint, conclusory allegations "are not entitled to the assumption of truth." Id. at 679.

# III.  ANALYSIS

The Court will first address the United States's motion to substitute, after which it will turn to the United States's and the federal defendants' motions to dismiss.  It will then consider the plaintiffs' motion for entry of default judgment against defendant Roses, followed by defendant Roses's motion to dismiss.

## A.      The United States's Motion to Substitute

### 1.       The Westfall Act

"The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." Osborn v. Haley, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)).  "The Westfall Act's 'core purpose,' as the Supreme Court has explained, 'is to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders.'"  Wuterich v. Murtha, 562 F.3d 375, 380 (D.C. Cir. 2009) (quoting Osborn, 549 U.S. at 252).  This purpose is achieved through the Westfall Act's substitution provision, which provides that:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his [or her] office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  In Wuterich, the District of Columbia Circuit provided the following description of the Westfall Act framework:

> [W]hen a federal employee is named in a tort suit, the Attorney General or his designee may certify that the employee was "acting within the scope of his [or her] office or employment at the time of the incident out of which the claim

arose."  Upon the Attorney General's certification, the federal employee is dismissed from the case and the United States is substituted as the defendant in place of the employee.  Thereafter, the suit is governed by the Federal Tort Claims Act ("FTCA") and is subject to all of the FTCA's exceptions for actions in which the Government has not waived sovereign immunity.  When one of these exceptions applies, the Attorney General's certification converts the tort suit into a FTCA action over which the federal court lacks subject matter jurisdiction and has the effect of altogether barring plaintiff's case.

A plaintiff may contest the Attorney General's scope-of-employment certification before a district court.  Once a plaintiff advances this argument, the certification "constitute[s] prima facie evidence that the employee was acting within the scope of his employment."  To rebut the certification and obtain discovery, a plaintiff must "alleg[e] sufficient facts that, taken as true, would establish that the defendant['s] actions exceeded the scope of [his] employment. If a plaintiff meets this pleading burden, he may, if necessary, attain "limited discovery" to resolve any factual disputes over jurisdiction.

This court has made it clear that "[n]ot every complaint will warrant further inquiry into the scope-of-employment issue."  Consequently, where a plaintiff fails to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant because the federal employee is absolutely immune from suit.

562 F.3d at 380-81 (internal citations omitted).

The Westfall Act exempts two types of claims against federal employees from its substitution requirement: (1) claims "brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A), and (2) claims "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized," id. § 2679(b)(2)(B); see United States v. Smith, 499 U.S. 160, 166-67 (1991).

## 2.      Application of the Westfall Act to the Plaintiffs' Claims

The first two counts of the First Amended Complaint seek to hold the federal defendants liable for tortious acts "in violation of the law of nations [that] are, therefore, actionable under the Alien Tort Statute, 28 U.S.C. § 1350."  Am. Compl. ¶¶ 135, 142.  In response to these claims, the Attorney General's designee has submitted a Westfall Act certification stating that the federal defendants "were acting within the scope of their federal office or employment at the time of the

incidents out of which the plaintiffs' claims arose." Gov't's Mot. to Sub., Ex. 1 (Certification of

Scope of Employment) at 1.[5]

The Court must initially address a somewhat peculiar issue raised by the United States's

Westfall Act certification. Although the certification states that the federal defendants "were

acting within the scope of their federal office or employment <u>at the time of the incidents out of</u>

<u>which the plaintiffs' claims arose</u>," <u>id.</u> (emphasis added), the "incident[]" upon which the

plaintiffs' claims are based is the Guatemala Study, which was conducted in the 1950s, long

before the federal defendants even assumed office. The United States seemingly acknowledges

this logical disconnect, but asserts that "[s]ubstitution [under the Westfall Act] is proper even

when the named federal employees were not actually involved in the alleged misconduct."

Gov't's Mot. to Sub. at 3 n.4. In support of this proposition, the United States relies on the

Supreme Court's decision in <u>Osborn</u>, where the Court held that a "Westfall Act certification is

proper [even] when a federal officer charged with misconduct asserts, and the Government

determines, that the incident or episode in suit never occurred." 549 U.S. at 247. The Court

reasoned that because the Westfall Act shields <u>negligent</u> employees both "from liability [and]

from suit . . . 'as a matter of course,' . . . it would make scant sense to read the Act as leaving an

employee charged with an <u>intentional tort</u> to fend for himself when he denies wrongdoing and

asserts he 'engaged only in proper behavior occurring wholly within the scope of his office or

employment.'" <u>Id.</u> at 248 (footnote and citations omitted; emphasis added). Rejecting Justice

Breyer's position that "when, in fact, '<u>nothing</u> involving the employee happened at all . . . no

---

[5] As the United States notes and the plaintiffs do not dispute, Gov't's Mot. to Sub. Reply at 1 n.1, the plaintiffs'
claims under the Alien Tort Statute do not fall within the Westfall Act's exemption for actions "brought for a
violation of a statute of the United States," 28 U.S.C. § 2679(b)(2)(B), because the Alien Tort Statute "is a
jurisdictional statute only," and "[a] claim brought under the [statute] therefore does not allege 'a violation of a
statute of the United States' satisfying the Westfall Act exception," <u>Ali v. Rumsfeld</u>, 649 F.3d 762, 778 (D.C. Cir.
2011) (citations omitted).

Westfall Act immunity would be available,'" the <u>Osborn</u> Court noted that "Congress did not, and sensibly should not, command that innocent employees be left outside the Westfall Act's grant of suit immunity." <u>Id.</u> at 248 n.12 (citations omitted and emphasis in original).

<u>Osborn</u>'s rationale logically extends to the situation at hand. Indeed, the plaintiffs' own allegations acknowledge, at least implicitly, that the federal defendants had nothing to do with the Guatemala Study. <u>See</u> 1st Am. Compl. ¶¶ 36-43 (seeking to hold the federal defendants liable based on their status as the "successor office-holder[s] for the . . . persons who were directly responsible for the unlawful actions alleged herein," but alleging no wrongdoing on the federal defendants' part). Thus, as "innocent employees," the federal defendants "should not . . . be left outside the Westfall Act's grant of suit immunity." <u>Osborn</u>, 549 U.S. at 248 n.12 (citation omitted). The Court therefore deems the United States's invocation of the Westfall Act's certification procedure appropriate in this case. Consequently, under the law of this Circuit, the certification "constitute[s] <u>prima facie</u> evidence that the [federal defendants were] acting within the scope of [their] employment," and "[t]o rebut the certification and obtain discovery, [the] plaintiffs must "alleg[e] sufficient facts that, taken as true, would establish that the defendant[s'] actions exceeded the scope of [their] employment." <u>Wuterich</u>, 562 F.3d at 381 (internal quotation marks and citations omitted).[6]

The plaintiffs seek to rebut the government's Westfall Act certification by showing that actions taken by the federal defendants' "predecessor officeholders" in connection with the

---

[6] The plaintiffs maintain that judicial review of a scope-of-employment certification under the Westfall Act is "[m]agnified" where, as here, the consequence of the certification would be total immunity for the federal defendants. Pls.' Consol. Opp'n at 12-13 (citing <u>Gutierrez de Martinez v. Lamagno</u>, 515 U.S. 417, 427-30 (1995), and <u>Stokes v. Cross</u>, 327 F.3d 1210, 1213 (D.C. Cir. 2003)). But the language the plaintiffs highlight from <u>Lamagno</u> and <u>Stokes</u> merely recognizes that Westfall Act certifications are judicially reviewable—neither decision held that a heightened level of scrutiny applies in cases where a Westfall Act certification would result in complete immunity against a plaintiff's claims. <u>See Lamagno</u>, 515 U.S. at 434; <u>Stokes</u>, 327 F.3d at 1213. The Court therefore will not employ any sort of "magnified" judicial review in considering the federal defendants' Westfall Act certification, and will instead apply the settled law of this Circuit. <u>E.g.</u>, <u>Wuterich</u>, 562 F.3d at 381-82.

Guatemala Study were outside the scope of their employment.  <u>See</u> Pls.' Consol. Opp'n at 13-20.

This argument, of course, rests on the premise that the federal defendants can be held

individually liable based solely on the misconduct of their "predecessor officeholders."  <u>Id.</u> at 14;

<u>see</u> 1st Am. Compl. ¶¶ 36-43.  However, there is no legal basis for imposing such liability.  <u>See</u>

<u>Lombard v. United States</u>, 690 F.2d 215, 227 (D.C. Cir. 1982) ("'The individually named

defendants are . . . improperly joined because it is not claimed that they actually participated in

the alleged violations.'" (quoting <u>Laswell v. Brown</u>, 683 F.2d 261, 268 (8th Cir. 1982)).  The

plaintiffs thus cannot rebut the United States's Westfall Act certification by relying on

allegations relating to the actions of the federal defendants' "predecessor officeholders"; rather,

they must show that the <u>federal defendants themselves</u> acted outside the scope of their

employment.  <u>See</u> <u>Wuterich</u>, 562 F.3d at 381 ("To rebut the certification and obtain discovery, a

plaintiff must 'alleg[e] sufficient facts that, taken as true, would establish that the <u>defendant['s]</u>

actions exceeded the scope of [his] employment.'" (emphasis added and citation omitted)).

Resisting this conclusion, the plaintiffs argue that the federal defendants "are liable under

the basic principles of successor liability."  Pls.' Consol. Opp'n at 34.  Yet, they cite no case law

illustrating these supposedly "basic principles."  <u>Id.</u>  The only authority they do cite is Federal

Rule of Civil Procedure 25(d), <u>id.</u>, which provides that "[a]n action does not abate when a public

officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office

while the action is pending," and that "[t]he officer's successor is automatically substituted as a

party," Fed. R. Civ. P. 25(d).  According to the plaintiffs, "[t]his procedural rule is a reflection of

the rule that an officeholder's death, resignation or cessation to hold office will not leave a

plaintiff with no remedy."  Pls.' Consol. Opp'n at 34.  But here again, the plaintiffs offer no

authority discussing the "rule" that Rule 25(d) is purportedly "a reflection of."  <u>Id.</u>  And Rule

25(d) is, in any event, plainly inapposite here because, by its terms, it only applies when a public officer is sued in his "official capacity," Fed. R. Civ. P. 25(d), and insofar as the plaintiffs are seeking to rebut the United States's scope-of-employment certification, they are necessarily suing the federal defendants in their individual capacities.[7]  Finally, the plaintiffs' conception of successor liability would lead to the unfair and perplexing result of imposing individual liability on innocent federal officials based solely on the misconduct of their predecessors.  The plaintiffs' successor liability theory is, in a word, without merit.[8]

The Court must therefore focus on the plaintiffs' allegations with respect to the federal defendants only, rather than their predecessors.  Construing the First Amended Complaint liberally, the only conduct of the federal defendants alleged by the plaintiffs is their assumption of public office decades after the Guatemala Study ended.  See 1st Am. Compl. ¶¶ 36-43.  The plaintiffs, not surprisingly, have set forth no facts showing that the federal defendants' assumption of public office occurred outside the scope of their employment.  Accordingly, because the plaintiffs have failed "to allege sufficient facts to rebut the certification, the United States must be substituted as the defendant" with respect to the plaintiffs' claims under the Alien Tort Statute, and those claim are, in turn, converted into FTCA claims against the United States, "subject to all of the FTCA's exceptions for actions in which the Government has not waived sovereign immunity."  Wuterich, 562 F.3d at 380-81 (citing Osborn, 549 U.S. at 230).

---

[7] The plaintiffs do not assert that they are suing the federal defendants in their official capacities.  However, assuming that they were, their suit would be regarded as one against the United States and sovereign immunity would consequently bar their claims for money damages absent a waiver of that immunity.  See Clark v. Library of Congress, 750 F.2d 89, 102-04 (D.C. Cir. 1984) ("If a plaintiff seeks to recover damages from a defendant in his personal, individual capacity then there is no sovereign immunity bar.  Sovereign immunity, however, does bar suits for money damages against officials in their official capacity absent a specific waiver by the government." (collecting cases)); Partovi v. Matuszewski, No. 09-5334, 2010 WL 3521597, at *1 (D.C. Cir. Sept. 2, 2010) (per curiam) ("Claims brought against government officials in their official capacity are generally treated as claims against the United States itself." (citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985))).

[8] As the federal defendants point out, the concept of successor liability appears to be unique to corporate litigation.  See Fed. Defs.' Mot. at 11 n.19.

**B.**      **The United States's Motion to Dismiss**

The United States moves to dismiss the plaintiffs' Alien Tort Statute claims pursuant to the FTCA's "foreign country exception."  Gov't's Mot. to Dismiss at 8.  Although the FTCA "gives federal district courts jurisdiction over claims against the United States for injury 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred,'" the Act contains a number of exceptions that "limit[] its waiver of sovereign immunity."  Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004) (quoting 28 U.S.C. § 1346(b)(1)).  At issue here is the FTCA's exception for "[a]ny claim arising in a foreign country," 28 U.S.C. § 2680(k), commonly called the "foreign country exception," Sosa, 542 U.S. at 701.  "[T]he FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred."  Id. at 712.

Here, the plaintiffs' Alien Tort Statute claims all arise out of injuries suffered in Guatemala, and the claims are thus barred by the FTCA's foreign country exception.  The plaintiffs concede as much by "acknowledg[ing] that, under ordinary circumstances, the exception to the general FTCA waiver of sovereign immunity . . . does not apply here because the facts of this case fall within the 'foreign country' exception to the sovereign immunity waiver."  Pls.' Consol. Opp'n at 22 (citing Sosa, 542 U.S. at 712).  They nevertheless assert that "the exception would work an injustice in this case" and accordingly ask the Court to create a "limited carve-out to the foreign country exception to the sovereign immunity waiver."  Id.  This the Court cannot do.  Because the FTCA's foreign country exception applies, the United States's sovereign immunity remains intact and the Court consequently lacks subject matter jurisdiction

over the plaintiffs' Alien Tort Statute claims.  See Harbury v. Hayden, 522 F.3d 413, 423 (D.C.

Cir. 2008) ("[W]e lack subject-matter jurisdiction to consider Harbury's tort claims . . . [that] fall

within [the FTCA's] foreign-country exception.").  And this Court is, of course, "powerless to

create its own jurisdiction" or "to employ untethered notions of what might be good public

policy to expand [its] jurisdiction."  Whitmore v. Arkansas, 495 U.S. 149, 155-56, 161 (1990).

Thus, the United States's motion to dismiss the plaintiffs' Alien Tort Statute claims for lack of

subject matter jurisdiction must be granted.

**C.      The Federal Defendants' Motion to Dismiss**

The plaintiffs assert constitutional claims under the Fifth and Eighth Amendments against

the federal defendants pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of

Narcotics, 403 U.S. 388 (1971).[9]  See 1st Am. Compl. ¶¶ 148-65; Pls.' Consol. Opp'n at 22.

The federal defendants argue that these claims must be dismissed because the plaintiffs "concede

that the . . . federal defendants did not personally violate any constitutional right."  Fed. Defs.'

Mot. at 11.  The Court agrees.[10]

For a Bivens claim to survive a motion to dismiss, "[t]he complaint must at least allege

that the defendant federal official was personally involved in the illegal conduct."  Simpkins v.

District of Columbia, 108 F.3d 366, 369 (D.C. Cir. 1997) (emphasis added); see Ashcroft v.

Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and §

1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution." (emphasis added)); Qian Ibrahim Zhao v.

---

[9] The United States did not move to substitute itself in place of the federal defendants under the Westfall Act with
respect to the plaintiffs' Bivens claims, presumably because the Act expressly does not apply to claims "brought for
a violation of the Constitution of the United States."  28 U.S.C. § 2679(b)(2)(A).

[10] The federal defendants actually couch their arguments in terms of qualified immunity.  See Fed. Defs.' at 11.  But
because their motion can be resolved by conducting a straightforward Rule 12(b)(6) analysis, the Court need not
address the qualified immunity argument.

Unknown Agent of CIA, 411 Fed. App'x 336, 336 (D.C. Cir. 2010) (per curiam) ("Appellant

failed to state a claim under Bivens . . . against the Secretary of the Department of Homeland

Security because he did not allege that the Secretary, through her 'own individual actions, has

violated the Constitution.'" (quoting Iqbal, 556 U.S. at 676)); Risley v. Hawk, 108 F.3d 1396,

1396 (D.C. Cir. 1997) (per curiam) ("[T]he district court properly concluded that appellant failed

to state a Bivens claim against defendants Hawk and Megathlin.  Absent allegations concerning

personal involvement by those defendants, appellant's Eighth Amendment claims against them

are nothing more than an allegation of respondeat superior, which is not cognizable in a Bivens

action.").  The plaintiffs contend that they are attempting to hold the federal defendants liable

under "principles of successor liability," rather than principles of "vicarious liability or

respondeat superior."  Pls.' Consol. Opp'n at 34.  But that is a distinction without a difference.

The bottom line is that a federal official cannot be held liable under Bivens absent personal

involvement in the alleged illegal conduct.  See Iqbal, 556 at 676.  Because the plaintiffs concede

that the federal defendants had no personal involvement in the Guatemala Study, see Pls.'

Consol. Opp'n at 34 (acknowledging that the "[p]laintiffs are unable to seek a remedy from the

individuals who actually committed the original wrongs—because they have all died" (emphasis

added)), they have failed to state a Bivens claim against the federal defendants.  Moreover, even

assuming that a Bivens claim could be maintained against a federal official based on a theory of

successor liability, the Court has already concluded that the plaintiffs' successor liability theory

has no legal basis.  See supra at 11-12.  The federal defendants' motion to dismiss the plaintiffs'

Bivens claims must therefore be granted.

 In addition to monetary damages, the plaintiffs seek a "declar[ation] that [the d]efendants

have violated [the p]laintiffs' human rights and the laws of the District of Columbia and the

United States," as well as "equitable relief[] permanently enjoining [the d]efendants from further engaging in human rights abuses against [the p]laintiffs and other inhabitants of Guatemala."  1st Am. Compl. at 45-46.  The federal defendants assert that "[t]hese requests fail as a matter of law" because the plaintiffs "have no standing to seek equitable relief from the individual defendants," Fed. Defs.' Mot. at 18, and the plaintiffs fail to respond to this argument in their opposition brief, see generally Pls.' Consol. Opp'n.  "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd 98 Fed. App'x 8 (D.C. Cir. 2004), cited with approval in Lewis v. District of Columbia, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam). Accordingly, the Court will deem the federal defendants' argument conceded and dismiss the plaintiffs' requests for equitable relief.

**D.     The Plaintiffs' Motion for Entry of Default Judgment Against Defendant Roses**

Federal Rule of Civil Procedure 55 "sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment." DirecTV, Inc. v. Agee, 405 F. Supp. 2d 6, 7 n.1 (D.D.C. 2005).  First, after a defendant has "failed to plead or otherwise defend" against an action, the plaintiff may request that the clerk of court enter default against that defendant.  Fed. R. Civ. P. 55(a).  Second, following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, the plaintiff may "apply to the court for a default judgment." Id. 55(b)(2).  "[B]ecause it seems inherently unfair to use the court's power to enter and enforce judgments as a penalty for delays in filing," and because "strong policies favor resolution of disputes on their merits," courts generally disfavor default judgments.

Jackson v. Beech, 636 F.2d 831, 835, 836 (D.C. Cir. 1980).  Accordingly, a "default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party," for "the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights."  Id. at 836 (citation omitted).

The plaintiffs filed their Complaint in this case on March 14, 2011, and defendant Roses was served with a summons on July 12, 2011.  Pls.' Mot. at 1-2.  After defendant Roses failed to respond to the Complaint within 60 days, the plaintiffs filed a motion for entry of default against Roses on September 14, 2011, ECF No. 10, which the Clerk of the Court granted on September 15, 2011, ECF No. 11.  The plaintiffs then "mailed a copy of the docket reflecting the Entry of Default to [Roses] via first-class, certified mail with delivery confirmation to both her business and home addresses," and "[a]ll four mailings were confirmed as received."  Pls.' Mot. at 2.  On October 6, 2011, the plaintiffs filed the instant motion for default judgment against Roses.  See id. at 1.  That same day, the Court entered a Minute Order directing, among other things, the federal defendants to respond to the plaintiffs' First Amended Complaint on or before January 9, 2012.  Minute Order, Garcia v. Sebelius, Civ. No. 11-527 (D.D.C. Oct. 6, 2011) (RBW).  In accordance with the deadline that the Court set for the federal defendants, Roses submitted her motion to dismiss and made her first appearance in the case on January 9, 2012.  See Roses's Mem. at 1.

Defendant Roses opposes the entry of a default judgment and seeks to have the Clerk's entry of the default vacated.  See id. at 4; Roses's Reply at 14-15.  Under Rule 55(c), "[t]he court may set aside an entry of default for good cause."  Fed. R. Civ. P. 55(c).  The decision to set aside an entry of default lies within the district court's discretion.  Jackson, 636 F.2d at 836.  "In exercising its discretion, the district court is supposed to consider 'whether (1) the default was

willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious.'"

Mohamad v. Rajoub, 634 F.3d 604, 606 (D.C. Cir. 2011) (citation omitted).

Regarding the willfulness factor, "[b]ad faith is not necessary to conclude that the defendant acted willfully."  Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc., 275 F.R.D. 20, 25 (D.D.C. 2011).  "'The boundary of willfulness lies somewhere between . . . a negligent filing error, which is normally considered an excusable failure to respond, and a deliberate decision to default, which is generally not excusable.'"  Id. (citation omitted).  Here, defendant Roses provides no explanation for why she defaulted, so it is difficult to ascertain whether the default was willful.  The plaintiffs maintain that Roses's "continued silence as to this failure to respond is a demonstration that such failure was willful," Pls.' Opp'n to Roses's Mot. at 8, and the Court is inclined to agree.  Still, in the absence of affirmative proof of willfulness, and recognizing that "all doubts are resolved in favor of the party seeking relief" from an entry of default, Jackson, 636 F.2d at 836, the Court finds that the willfulness factor weighs only slightly against vacating the default.

The remaining two factors, however, weigh heavily in favor of vacating the default.  As to the second factor, the plaintiffs have not shown or even argued that Roses's delay prejudiced them.  Nor could they, since this case was stayed at the plaintiffs' request for several months pending release of the Presidential Commission Report, the Court entered a briefing schedule after the Report was released governing the filing of dispositive motions, and Roses filed her motion to dismiss in accordance with that briefing schedule.  This is therefore not a situation where "the adversary process has been halted because of an essentially unresponsive party," Jackson, 636 F.2d at 836 (citation omitted); rather, the litigation proceeded in due course despite Roses's default.  Finally, as the Court will explain below, Roses's alleged defense is indeed

meritorious, for she is entitled to statutory immunity both from suit and legal process.  See 22

U.S.C. § 288d(b).  The Court therefore must set aside the Clerk's entry of default, and deny the

plaintiffs' motion for entry of a default judgment against Roses.

The plaintiffs maintain that if the Court decides to vacate the default, Roses should be

ordered "to reimburse them for mailing and court costs and attorney's fees incurred in sending

numerous notices and filing for default because of her failure to respond."  Pls.' Opp'n to

Roses's Mot. at 9.  Roses does not object or even respond to this request.  See Roses's Reply at

14-15.  "'In determining whether to exercise its discretion to set aside a default, . . . a district

court has inherent power to impose a reasonable condition on the vacatur in order to avoid undue

prejudice to the opposing party.'"  Capital Yacht Club v. Vessel AVIVA, 228 F.R.D. 389, 395

(D.D.C. 2005) (quoting Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 515-16 (2d Cir. 2001)).

And "[t]he condition most commonly imposed is that the defendant reimburse the plaintiff for

costs—typically court costs and attorney's fees—incurred because of the default."  Thorpe v.

Thorpe, 364 F.2d 692, 694 (D.C. Cir. 1966).  The Court finds the imposition of this condition

appropriate here, in view of Roses's initial failure to respond to the Complaint and the costs and

attorney's fees incurred by the plaintiffs as a result of Roses's default.  Thus, the Court will

condition its vacatur of the Clerk's default upon Roses's reimbursement of the plaintiffs'

reasonable fees and costs, subject to the terms set forth in the Order accompanying this

Memorandum Opinion.

**E.      Defendant Roses's Motion to Dismiss**

The plaintiffs bring this action against defendant Roses in her official capacity as the

current Director of the Pan-American Health Organization ("PAHO") (which was formerly

called the Pan-American Sanitary Bureau), based on that organization's involvement in the

Guatemala Study.  See Pls.' Opp'n to Roses's Mot. at 9 n.3, 1, 3.  Roses moves to dismiss the

plaintiffs' claims for lack of subject matter jurisdiction, asserting immunity under the

International Organizations Immunities Act of 1945 ("IOIA"), 22 U.S.C. § 288a(b) (2006).

Roses's Mem. at 1.  For the following reasons, the Court agrees that Roses is entitled to

immunity under the IOIA.

> The IOIA provides that
>
> [i]nternational organizations, their property and their assets, wherever located, and
> by whomsoever held, shall enjoy the same immunity from suit and every form of
> judicial process as is enjoyed by foreign governments, except to the extent that
> such organizations may expressly waive their immunity for the purpose of any
> proceedings or by the terms of any contract.

22 U.S.C. § 288a(b).  By Executive Order, the PAHO has been designated an "international

organization" entitled to immunity under the IOIA.  See Exec. Order No. 10864, 25 Fed. Reg. at

1507 (1960); Tuck v. PAHO, 668 F.2d 547, 550 n.5 (D.C. Cir. 1981).  The IOIA also immunizes

Roses for acts performed in her official capacity as the Director of the PAHO.  See 22 U.S.C. §

288d(b) ("[O]fficers and employees of [international] organizations shall be immune from suit

and legal process relating to acts performed by them in their official capacity and falling within

their functions as such representatives, officers, or employees except insofar as such immunity

may be waived by the foreign government or international organization concerned."); Tuck, 668

F.2d at 550 ("We also find Dr. Acuna immune from suit in his official capacity [because, t]o the

extent that the acts alleged in the complaint relate to Dr. Acuna's functions at [sic] PAHO

Director, the provisions of 22 U.S.C. s 288d(b) (1976) protect him from suit.").

The Circuit has held that "Congress' intent" in regards to the IOIA "was to adopt th[e]

body of law only as it existed in 1945—when immunity of foreign sovereigns was absolute."

Atkinson v. Inter-American Development Bank, 156 F.3d 1335, 1341 (D.C. Cir. 1998).  Thus,

"the IOIA provides absolute immunity from suit to organizations" such as the PAHO.  Inversora

Murten, S.A. v. Energoprojekt-Niskogradnja Co., 264 Fed. App'x 13, 15 (D.C. Cir. 2008) (per

curiam).  This immunity is, however, "subject to two sources of limitation."  Mendaro v. World

Bank, 717 F.2d 610, 613 (D.C. Cir. 1983).  "First, the organization itself may expressly waive its

immunity," id.; see 22 U.S.C. § 288a(b), as well as the immunity of its "officers and employees,"

id. § 288d(b).  "Second, the President may specifically limit the organization's immunities when

he selects the organization as one entitled to enjoy the Act's privileges and immunities."

Mendaro, 717 F.2d at 613.  The President has not so limited the PAHO's immunity, leaving a

waiver of IOIA immunity as the only potential basis for this Court's jurisdiction over the

plaintiffs' claims against Roses.

The plaintiffs first contend that the PAHO's immunity has been waived by Article 67 of

the Constitution of the World Health Organization ("WHO"),[11] Pls.' Opp'n to Roses's Mot. at 9-

10, which provides:

> (a) The [WHO] shall enjoy in the territory of each Member such privileges and
> immunities as may be necessary for the fulfilment [sic] of its objective and for the
> exercise of its functions.
>
> (b) Representatives of Members, persons designated to serve on the Board and
> technical and administrative personnel of the [WHO] shall similarly enjoy such
> privileges and immunities as are necessary for the independent exercise of their
> functions in connexion [sic] with the [WHO].

Constitution of the World Health Organization, art. 67, July 22, 1946, 62 Stat. 2679, 14 U.N.T.S.

185.  In addressing the plaintiffs' waiver argument, it bears emphasizing that "under national and

international law, waivers of immunity must generally be expressly stated."  Mendaro, 717 F.2d

---

[11] Although the PAHO is an independent organization that operates under its own constitution, it has entered into a
bilateral agreement under which it serves as the WHO's regional office for the Americas.  See Roses's Reply at 3;
Roses's Mem. at 3.  And Roses concedes that the WHO Constitution is a "governing document" with respect to the
PAHO.  See Roses's Reply at 4.

at 617.  Consistent with this principle, the IOIA confers immunity "except to the extent that [international] organizations expressly waive their immunity for the purpose of any proceedings or by the terms of any contract."  22 U.S.C. § 288a(b) (emphasis added).  "The requirement of an express waiver suggests that courts should be reluctant to find that an international organization has inadvertently waived immunity when the organization might be subjected to a class of suits which would interfere with its functions."  Mendaro, 717 F.2d at 617.

Applying these principles, the Court does not construe Article 67 of the WHO Constitution as a waiver of the PAHO's immunity under the IOIA.  The provision merely affirms that the WHO—and, by extension, the PAHO—enjoys "such privileges and immunities as may be necessary for the fulfilment [sic] of its objective and for the exercise of its functions," without purporting to waive the organization's immunity in any respect.  Constitution of the World Health Organization, art. 67, July 22, 1946, 62 Stat. 2679, 14 U.N.T.S. 185.  The plaintiffs appear to contend (although this is not entirely clear) that Article 67 waives the PAHO's immunity, by negative implication, in cases where immunity is not "necessary for the fulfilment [sic] of its objective and for the exercise of its functions."  Id.  But if that is the argument being advanced, the plaintiffs are asking the Court to infer a waiver of immunity, which runs contrary to the IOIA's "requirement of an express waiver."  Mendaro, 717 F.2d at 617.  This express waiver requirement was aptly illustrated in Mendaro, where the Circuit found a waiver of IOIA immunity based on language in the World Bank's Articles of Agreement which provided that "[a]ctions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities."  Id. at 614.  In contrast to the "facially broad waiver of immunity" in Mendaro, id. at 611, Article 67 of the

WHO Constitution does not establish the conditions under which "actions may be brought against" the WHO—it simply states that the organization is entitled to immunity in some circumstances, without necessarily foreclosing its immunity in others.  Thus, because waivers of IOIA immunity must be expressly made, and because the WHO Constitution does not expressly waive the PAHO's or Roses's immunity in this case, the plaintiffs' position must be rejected.

The plaintiffs next claim that the PAHO is required to waive its immunity under the United Nations' Convention on Immunities and Privileges for Specialized Agencies ("U.N. Convention"), Pls.' Opp'n to Roses's Mot. at 10, which provides that "[e]ach specialized agency shall have the right and duty to waive the immunity of any official in any case where, in its opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the specialized agency," G.A. Res. 179 (II), art. VI § 22, U.N. Doc. A/503 (Nov. 21, 1947).   Yet, even assuming that an international organization could be deemed to have waived its IOIA immunity merely by entering into the U.N. Convention, the Court is not convinced that the provision of the U.N. Convention relied upon by the plaintiffs <u>expressly</u> waives the PAHO's immunity in this case.  Although the provision does specify that an organization has a "duty" to waive immunity under certain conditions, it vests an organization with discretion to waive immunity only when, "in its opinion," the organization deems those conditions are met.  <u>Id.</u>  Nothing in the provision mandates a general waiver of immunity, or establishes circumstances under which an organization can be sued.  The Court therefore rejects the plaintiffs' position that the U.N. Convention requires the PAHO to waive its immunity in this case.

The plaintiffs also rely on a line of cases from "this Circuit finding a waiver [of IOIA immunity] where there is a corresponding benefit to the [international organization's]

objectives." Pls.' Opp'n to Roses's Mot. at 10.  However, in all of the cases cited by the

plaintiffs, the Circuit was addressing the scope of waiver provisions found in the charters of

various international organizations, meaning that the court's analysis in each decision was

predicated on the existence of an express waiver of immunity.  See Vila v. Inter-American

Invest., Corp., 570 F.3d 274, 278-80 (D.C. Cir. 2009) (holding that the "waiver provision" in the

Inter-American Investment Corporation's charter waived the organization's immunity with

respect to the plaintiff's "unjust enrichment claim"); Osseiran v. Int'l Fin. Corp., 552 F.3d 836,

840-41 (D.C. Cir. 2009) (holding that "the broad language of the waiver in International

Finance's charter is controlling and that the corporation does not have immunity from Osseiran's

claims"); Inversora Murten, S.A., 264 Fed. App'x at 15 (stating that "to overcome the World

Bank's immunity, appellants must rely on the express waiver in the organization's Articles of

Agreement," and concluding that the appellants' claims did not fall within the scope of the

waiver); Mendaro, 717 F.2d at 611, 617 (holding that the "facially broad waiver of immunity" in

the "World Bank's Articles of Agreement" did not "waive the Bank's immunity to employee

suits").  Since the plaintiffs have identified no express waiver of immunity here, these cases are

inapposite.[12]

---

[12] Relying primarily on Mendaro, 717 F.2d at 610, the plaintiffs contend that "not applying immunity in this case is consistent with what the D.C. Circuit has repeatedly articulated are the limited circumstances under which an [international organization] should enjoy immunity." Pls.' Opp'n to Roses's Mot. at 9; see id. at 9-16.  This argument distorts the law of this Circuit.  Mendaro and its progeny simply provide a framework for determining whether a "'nonspecific waiver'" in an international organization's charter "waive[s] a specific type of lawsuit." Vila, 570 F.3d at 368 (quoting Mendaro, 717 F.2d at 617).  Thus, rather than describing the supposedly "limited circumstances under which an [international organization] should enjoy immunity," Pls.' Opp'n to Roses's Mot. at 9, these cases address the narrower question of how an express waiver of immunity should be construed, a question which, as noted above, necessarily entails the existence of an express waiver provision in the first instance.

Finally, the plaintiffs contend that IOIA immunity does not extend to the PAHO or Roses for any acts that occurred prior to the PAHO's designation by the President as an "international organization" in July of 1946.  Pls.' Opp'n to Roses's Mot. at 16.  As Roses points out, Roses's Reply at 13, the District of Columbia Court of Appeals has rejected an identical argument in a case concerning IOIA immunity:

> Appellant . . . contends that the Executive Order cannot operate retroactively to immunize Intelsat from a cause of action which arose before the order issued.  We disagree.  The date upon which the cause of action arose is not material to the question of immunity.  The crucial date is that on which the complaint is filed.  If a cause of action arises and an individual or organization is subsequently clothed with immunity, courts lack jurisdiction to entertain actions brought against such individuals or organizations so long as the immunity exists.

Weidner v. Int'l Telecomm. Satellite Org., 392 A.2d 508, 510 (D.C. 1978) (emphasis added), cited in Mendaro, 717 F.2d at 616-17.  Finding the reasoning of Weidner persuasive, the Court adopts it here and concludes that because the PAHO and Roses were entitled to IOIA immunity when the plaintiffs filed their Complaint, the Court lacks jurisdiction over the plaintiffs' claims against Roses regardless of when those claims accrued.

## IV.  CONCLUSION

As the plaintiffs assert, and the defendants acknowledge, the Guatemala Study is a deeply troubling chapter in our Nation's history.  Yet, for the various reasons identified above, this Court is powerless to provide any redress to the plaintiffs.  Their pleas are more appropriately directed to the political branches of our government, who, if they choose, have the ability to grant some modicum of relief to those affected by the Guatemala Study.  And it appears that those remedial efforts may be forthcoming, based on the United States's representation to the Court that it "is committed to taking appropriate steps to address" the "terrible wrong[s]" that

occurred in Guatemala.  Gov't's Mot. to Sub. at 2.  This lawsuit, however, is simply not the appropriate vehicle for remedying those wrongs.

Accordingly, the defendants' various motions to dismiss are granted, and the plaintiffs' motion for the entry of default judgment against Roses is denied.

**SO ORDERED** this 13th day of June, 2012..[13]

REGGIE B. WALTON
United States District Judge

---

[13] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.